# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| UNITED STATES OF AMERICA | : | |
| --- | --- | --- |
| v. | : | CRIM. NO. 24-cr-190 |
| IBODULLO MUHIDDINOV NUMANOVICH | : | |

## GOVERNMENT'S MOTION FOR PRETRIAL DETENTION

The United States of America, by and through Jacqueline C. Romero, United States Attorney for the Eastern District of Pennsylvania, and Danielle S. Bateman, and Timothy M. Stengel, Assistant United States Attorneys for the District, hereby submits this Motion for Pretrial Detention in advance of the detention hearing scheduled for Thursday May 23, 2024.

The Defendant, Ibodullo Muhiddinov Numanovich, has been charged by Indictment with one count of stalking his ex-wife, in violation of 18 U.S.C. § 2261A(2). The government respectfully submits that pretrial detention is warranted and necessary in this case. The nature of the defendant's crime, the substantial weight of the government's evidence, as well as the defendant's access to substantial resources and the breadth of his suspected criminal activity, all demonstrate that the defendant poses a serious and unmitigable risk of flight, a serious risk that the Defendant will, or will attempt to, threaten, injure, or intimidate a prospective witness, and that the Defendant poses a danger to the safety of the victim and the community. *See* 18 U.S.C. § 3142. Because no condition or combination of conditions will reasonably assure the defendant's appearance as required and the safety of any other person, including the victim in this case, and the community, the government requests that the Defendant be detained pending trial. *See* 18 U.S.C. § 3142(e) and (f).

1

I.  **FACTS**

As described below, over the course of several weeks, the Defendant relentlessly stalked his ex-wife, S.K., and engaged in a pattern of threatening conduct toward her. The Government's investigation has revealed domestic violence by the Defendant against the victim. In addition, the Defendant has access to substantial financial resources and is believed to be involved in a large-scale human smuggling network in connection with a transnational organized crime network.

The defendant is a citizen of Tajikistan who is currently undergoing immigration proceedings.[1] He entered the United States at the Rio Grande City, Texas border crossing on July 17, 2015, without a visa or other valid admission documentation. In January of 2021, the Defendant married the victim, S.K., in a religious ceremony, just shortly after S.K. was released from Immigration and Customs Enforcement custody. The government's investigation has revealed that S.K. was likely smuggled into the United States through a Russia-based human smuggling network with or for whom the Defendant works.

Beginning shortly after their marriage, the Defendant began to physically and emotionally abuse S.K. and to record multiple sexually explicit videos of S.K. The Defendant threatened to release the images and videos if S.K. did not do as the Defendant demanded. At the time of their marriage, S.K. had recently arrived from Tajikistan, by way of Mexico, and did not have any other family or support in the United States. Records received from the Philadelphia Police Department

---

[1] U.S. Immigration and Customs Enforcement has lodged an immigration detainer against the Defendant. Detention of a criminal defendant pending trial and detention of a removable alien. pending immigration proceedings are separate functions that serve separate purposes and are performed by different authorities. *United States v. Soriano Nunez*, 928 F.3d 240, 245–46 (3d Cir. 2019). The Government recognizes that "the presence of an ICE detainer and the threat of potential removal *alone* are not sufficient to deny BRA release." *United States v. Soriano Nunez*, 928 F.3d 240, 245 (3d Cir. 2019) (emphasis added). Regardless of the ICE detainer, the Bail Reform Act factors favor detention.

revealed a domestic violence report from an incident on April 17, 2023. The report indicates that S.K. was tearing, crying, shaking, and frightened and had visible bruises and swelling to the left side of her face. Photographs obtained from the victim from the time of the incident corroborate the abuse.

At some point, the Defendant married another woman ("D.N.") and moved D.N. into his home with S.K. Ultimately, the Defendant agreed to divorce S.K. However, even after the Defendant and S.K. were divorced, the Defendant continued to threaten S.K, by, among other things, leaving her threatening voicemails, calling her repeatedly, following her throughout Philadelphia, and going to her residence. Starting no later than March of 2024, the Defendant began placing AirTags on S.K.'s vehicle to surveil and stalk her.

On or about March 27, 2024, the FBI learned that the Defendant had placed an AirTag on S.K.'s vehicle, which S.K. had removed.

On April 18, 2024, the FBI located a second AirTag that the Defendant had placed on S.K.'s vehicle. That AirTag, bearing serial number HGMKHHERP0GV, was taped underneath the front bumper of S.K.'s vehicle with white duct tape (see images below). The FBI removed and disabled this AirTag at a parking lot in Feasterville-Trevose, Pennsylvania. Records received from Apple pursuant to legal process revealed that Apple AirTag, serial number HGMKHHERP0GV was unpaired from the Defendant's Apple account on April 21, 2024.

3




On April 19, 2024, the FBI located a third AirTag that the Defendant had placed on S.K.'s vehicle. This AirTag, bearing serial number HGMKHHNLP0GV, was wrapped in a blue medical mask and secured under the vehicle near the rear passenger side wheel well (see images below). The FBI removed this AirTag from S.K.'s vehicle and disabled it. The FBI conducted a secondary search of S.K.'s vehicle, using Bluetooth technology and did not detect any additional AirTags.




That evening, S.K. returned briefly to her residence as she planned to stay with a relative for the night. After leaving her residence, S.K. discovered a fourth AirTag had been placed in her

4

side-view mirror under the casing (see below). It is believed that this AirTag was placed during the short time frame during which she was in her residence.

 

On April 23, 2024, S.K. provided the FBI with the fourth AirTag which had been placed in S.K.'s vehicle's side mirror on or around the evening of April 19, 2024. That AirTag bore serial number J09M3HVUP0GV. The FBI deactivated the AirTag at a specific location in Philadelphia. Later that same day, the FBI observed the Defendant arrive to the location where they had deactivated the AirTag, exit his vehicle with his phone in his hand, and begin searching for the AirTag. Shortly thereafter, the Defendant departed the area and was last observed approaching the vicinity of the parking lot in Feasterville-Trevose where the FBI had deactivated the AirTag on April 18, 2024. Records received from Apple pursuant to legal process revealed that Apple AirTag, serial number J09M3HVUP0GV attempted to pair with the Defendant's Apple account on Apple on April 19, 2024, and was unpaired from the Apple ID on April 23, 2024.

Between April 19, 2024, when S.K. located the fourth AirTag, and April 23, 2024, when the FBI deactivated it, the Defendant called S.K. and followed her to a carwash. The Defendant approached S.K.'s vehicle, banged on her windows, and demanded to know why S.K. was not answering his calls. S.K. was paralyzed with fear by the Defendant's actions.

On April 25, 2024, S.K. received 5 voice messages from the Defendant between 11:36 a.m. and 11:46 a.m. during which the Defendant yelled and cursed at S.K., and threatened her. According to a translation of the messages, among other things, the Defendant stated:

> You don't deserve my salutation . . . ungrateful . . . you are worse than an animal. You are not a human. I said hello to you for the past three days. You are not human. No sign of humanity in you. You've lost everything . . . not even as a human being with good manners . . . do you understand me? Say no more. I will never look at you face, and I will never in my life say hello to you . . . do you understand me?
>
> You are not human. You are despicable, and you are a despicable person . . . you understand? Move away and don't look at me in the eye . . . I will say bad things to you and spit at your face . . . I'll call you despicable person . . . you are a bad-mannered person.
>
> It's okay, you will see . . . I have your photos. It is okay, I swear to God. I don't care that you were a wife or a mother . . . I'll show you . . . do you understand me? I have everything . . . same as you. You never deleted anything from your phone. Me neither . . . I ill not delete anything in life . . ..…understand?"

On April 26, 2024, the FBI removed a fifth AirTag that the Defendant had placed on S.K.'s vehicle. This AirTag, bearing serial number J09M3EKGP0GV, was located in an opening within the vehicle's frame. The opening in the frame created a small, makeshift compartment which appeared to have previously been sealed with a rubber plug, but the rubber plug was pushed into the compartment. The AirTag was wrapped inside a yellow rag (see image below). The FBI removed this AirTag from S.K.'s vehicle and disabled it. Records received from Apple pursuant to legal process revealed that Apple AirTag, serial number J09M3EKGP0GV attempted to pair

with the Defendant's Apple account on April 23, 2024, and was unpaired from it on April 26, 2024.



According to information obtained from a cell-site warrant, on the evening of April 26, 2204, the Defendant's cellphone pinged approximately 3/10 of a mile from where the aforementioned AirTag been deactivated just over two hours earlier that day.

On April 27, 2024, at approximately 3:05 a.m., the Defendant's cell phone pinged approximately 0.2 miles from S.K.'s apartment. At approximately 9:26 a.m., S.K.'s cellphone alerted her to the presence of an AirTag near her. S.K. located the AirTag underneath the license plate on her car (see below).



On May 2, 2024, the FBI removed the aforementioned sixth AirTag from S.K.'s vehicle. The FBI removed the battery only briefly to document the serial number, and then placed the battery back into the AirTag ensuring that the AirTag continued to work. The agents then placed the AirTag in a grassy area near a Wawa. A few hours later, the Defendant appeared at the Wawa and was observed looking for the AirTag.

Later, on May 2, 2024, S.K. received another notification that a seventh AirTag was traveling near her. According to the ping on the Defendant's phone, he was near S.K.'s apartment the night before.

On May 8, 2024, the Defendant was indicted in this case. On May 13, 2024, the Honorable Richard A. Lloret authorized a search warrant for the Defendant's vehicle, residence, person and devices for evidence relating to violations of 18 U.S.C. § 2261A (stalking) as well as wire fraud, bank fraud, money laundering and bringing in and harboring certain aliens.

The review of evidence seized pursuant to that warrant is ongoing. Located on the Defendant's phone was a folder he had created that contained approximately 140 sexually explicit photographs and videos of S.K.

Records seized pursuant to that warrant along with the Government's investigation has revealed that the Defendant controls numerous financial accounts opened in other individual's names through which he receives and transfers substantial funds. For example, bank records reveal that over an approximate 7-month period in 2022, a bank account operated by the Defendant conducted transfers totaling more than $2.3 million. Another bank account operated by the Defendant conducted approximately $2.2 million in transactions between February of 2022 and April of 2023. A third account operated by the Defendant revealed approximately $74,000 in deposits and $64,872 in withdrawals in a one-month period at the end of 2022.

In addition, the FBI seized bank records for an account opened in D.N.'s name, including physical transfer, withdrawal, and deposit slips, revealing approximately $81,500 in transactions between December 28, 2023, and April 30, 2024. The FBI also seized a confirmation of a bank wire from that same account opened in D.N.'s name revealing a wire of $58,830 from D.N.'s account to another account in November of 2023. In addition, the FBI seized receipts of USPS money orders between February 2024 and May 2, 2024, totaling approximately $27,301.30. Other bank records were seized revealing accounts operated by the Defendant through which substantial funds transited.

The search also resulted in the seizure of passport style photographs of other individuals, a Tajik passport belonging to someone other than the Defendant, a Philadelphia driver's license belonging to someone other than Defendant, an international driver's license belonging to someone other than the Defendant, and immigration documents for individuals other than the Defendant and his family. Also seized were envelopes and mail addressed to more than 20 different individuals to an apartment the Defendant leased until, at least, April 31, 2024. Many of those envelopes contained official government mail to the recipients, but which the Defendant was in possession of for unknown reasons. In addition, the FBI seized eight titles to eight different vehicles, five of which were titled to the Defendant and three of which were titled to other individuals. The FBI also seized numerous EZ-pass and traffic violations for approximately 20 different license plates, all of which were addressed to the Defendant.

### A. <u>Maximum Penalties and Sentencing Guidelines</u>

The defendant faces a maximum penalty of five years' imprisonment, three years' supervised release, a $250,000 fine and a $100 special assessment.

With an estimated offense level of 20 and a Criminal History Category of I, the Defendant faces an estimated advisory Sentencing Guidelines range of 33-41 months in prison.

## II. LEGAL ARGUMENT

Under the Bail Reform Act of 1984, a judicial officer may order the pretrial detention of a person charged with an offense only if "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e). The Government carries the burden of establishing that the defendant is a risk of flight by a preponderance of the evidence. *United States v. Himler*, 797 F.2d 156, 161 (3d Cir. 1986). Where danger to the community is at issue, the Government must prove that no condition or combination of conditions will reasonably assure the safety of any other person and the community by clear and convincing evidence. *Id*. The Court considers the following factors to determine whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the person; (3) the history and characteristics of the person; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

*First*, the nature and circumstances of the offense support pretrial detention. As set forth above, the Defendant has engaged in a persistent pattern of stalking, threatening, abusing, and harassing S.K. The Defendant continued to adapt and use increasingly sophisticated efforts to hide the AirTags he placed on S.K.'s car. It is clear from the timing of the placement of the AirTags and corroborating cell-site data, that he was monitoring S.K.'s movements. In addition, located on the Defendant's cellular telephone was a folder he created to store approximately 140 sexually explicit photographs and videos of S.K. As discussed above, the Defendant has threatened to

release those photographs and videos if S.K. does not abide by his demands. The Defendant poses a serious risk of continuing to intimidate, harass, and threaten a witness—namely, the victim—and is a danger to the victim and to the community.

*Second,* the substantial evidence against the defendant and the strong likelihood of a conviction, coupled with the sentence that he faces and potential immigration consequences of such sentence, incentivizes the defendant to flee and weighs against pretrial release. At least three of the AirTags recovered from S.K.'s car were registered to the Defendant's Appel account. Cell-site location data places the Defendant at or near the victim's home and locations where the AirTags were disabled. Moreover, the FBI physically observed the Defendant traveling to the locations where two of the AirTags had been disabled. In addition, the Defendant sent the victim threatening messages which were recorded.

*Third,* the defendant does not appear to have lawful and gainful employment and has minimal ties to the community. In addition, the Defendant appears to have substantial connections with foreign associates and a human smuggling network. The evidence has also shown that he is in possession of other individual's identity documents, that he uses other people's bank accounts to conduct millions of dollars in transactions, and that he owns numerous vehicles and has dozens of license plates registered in his name. Indeed, the evidence collected thus far suggests that the Defendant has *used his own family to commit crimes* by using their accounts to conduct tens of thousands of dollars in financial transactions for which there is no apparent lawful explanation. The Defendant recently traveled from Philadelphia to Louisiana and back again over the course of a few days and cell-site information places him near the vicinity of an immigration detention center. Moreover, the Defendant recently obtained a commercial driver's license.

*Fourth*, as set forth above, the Defendant's release would present a serious risk of danger to the victim and the community. The Defendant resides in close proximity to the victim and has engaged in a relentless and concerted pattern of stalking, threatening, and harassing her. In addition, the Defendant has a history of physical abuse toward the victim.

### III. CONCLUSION

For the reasons described above, no condition or combination of conditions will reasonably assure the Defendant's presence as required in this case nor the safety of victim and the community. The defendant poses a serious flight risk, obstruction and witness tampering, and danger to the victim and community that cannot be mitigated by any condition or combination of conditions set by this Court.

WHEREFORE, the government respectfully requests the Court to detain the Defendant prior to trial.

Respectfully submitted,

JACQUELINE C. ROMERO
United States Attorney


*/s/ Danielle S. Bateman*
DANIELLE S. BATEMAN
TIMOTHY M. STENGEL
Assistant United States Attorneys

# CERTIFICATE OF SERVICE

I certify that a copy of the Government's Motion for Pretrial Detention, and Proposed Order was served by e-mail on the following defense counsel:

Mark Wilson, Esq.
Federal Community Defender Office for the Eastern District of Pennsylvania
601 Walnut Street, Suite 540W
Philadelphia, PA 19106

/s/ Danielle S. Bateman
DANIELLE S. BATEMAN
Assistant United States Attorney

Date: May 23, 2024