IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIMINAL NO.'s 24-cr-190 and 25-105 |
| IBODULLO NUMANOVICH MUHIDDINOV | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by David Metcalf, United States Attorney for the Eastern District of Pennsylvania, and Everett Witherell, Assistant United States Attorney, hereby submits this Sentencing Memorandum in anticipation of the hearing scheduled for March 9, 2026.

A sentencing court follows a two-step process, first calculating the range under the Sentencing Guidelines, and then considering that range along with all pertinent 18 U.S.C. § 3553(a) factors in determining the appropriate sentence. *See* USSG § 1B1.1 (Nov. 1, 2025).[1]

At the second step of the sentencing process, "[t]he record must demonstrate the trial court gave meaningful consideration to the § 3553(a) factors. . . . [A] rote statement of the § 3553(a) factors should not suffice if at sentencing either the defendant or the prosecution properly raises 'a ground of recognized legal merit (provided it has a factual basis)' and the court fails to address it." *United States v. Cooper*, 437 F.3d 324, 329-30 (3d Cir. 2006) (citations omitted). *See also Rita v. United States*, 551 U.S. 338, 356 (2007) ("The sentencing judge should

---

[1] Courts previously followed a three-step process, in which the court first calculated the guideline range, then next ruled on motions for departure, before considering the 3553(a) factors. *See United States v. Gunter*, 462 F.3d 237, 247 (3d Cir. 2006). In an extensive amendment to the Guidelines effective November 1, 2025, the Sentencing Commission eliminated the departure provisions in the manual and dictated the two-step process described above.

set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority."); *United States v. Flores-Mejia*, 759 F.3d 253, 256 (3d Cir. 2014) (en banc) ("Failure to give 'meaningful consideration' to any such argument renders a sentence procedurally unreasonable which, when appealed, generally requires a remand for resentencing.").

The government explains below its view of the proper consideration in this case of the advisory guideline range and of the Section 3553(a) factors

I.  **BACKGROUND**

On May 8, 2024, a grand jury sitting in the Eastern District of Pennsylvania returned a one-count Indictment in Docket No. 24-190-01 charging the defendant with stalking, in violation of 18 U.S.C. § 2261A(2).

On March 19, 2025, the U.S. Attorney's Office filed a two-count Information in Docket No. 25-105-01 charging the defendant with conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h) (Count 1); and conspiracy to bring aliens to the United States, in violation of 8 U.S.C. § 1324(a)(1)(A)(v)(1) (Count 2).

On March 26, 2025, the defendant appeared before the Honorable Wendy Beetlestone and, pursuant to a written plea agreement, pled guilty to all counts in both cases.  These matters have been consolidated for purposes of sentencing, which is listed for March 9, 2026 before this Court.

II.  **FACTS OF THE CASE**

The defendant agreed to the following facts at his change of plea hearing:

**A.  Stalking (Case No. 24-cr-190)**

From at least March 27, 2024, through May 7, 2024, the Defendant secretly placed at least six Apple AirTags on his ex-wife's ("S.K.") vehicle, for the purpose of tracking, stalking, harassing and intimidating her. The Apple AirTags connected to the Internet and enabled the Defendant to follow his ex-wife's movements in real time in and around the Eastern District of Pennsylvania and the District of New Jersey. The Defendant's repeated placing of Apple AirTags on his ex-wife's car caused her substantial emotional distress and placed her in fear of physical harm.

Beginning shortly after their marriage, the Defendant began to physically and emotionally abuse S.K. At the time of their marriage, S.K. had recently arrived from Tajikistan, by way of Mexico, and did not have any other family or support in the United States. Records received from the Philadelphia Police Department revealed a domestic violence report from an incident on April 17, 2023. The report indicates that S.K. was tearing, crying, shaking, and frightened and had visible bruises and swelling to the left side of her face. Photographs obtained from the victim from the time of the incident corroborate the abuse.

At some point, the Defendant married another woman ("D.N.") and moved D.N. into his home with S.K. Ultimately, the Defendant agreed to divorce S.K. However, even after the Defendant and S.K. were divorced, the Defendant continued to threaten S.K, by, among other things, leaving her threatening voicemails, calling her repeatedly, following her throughout Philadelphia, and going to her residence. Starting no later than March of 2024, the Defendant began placing AirTags on S.K.'s vehicle to surveil and stalk her.

On or about March 27, 2024, the FBI learned that the Defendant had placed an AirTag on S.K.'s vehicle, which S.K. had removed.

On April 18, 2024, in the Eastern District of Pennsylvania, the FBI located and removed a second AirTag that the Defendant had placed on S.K.'s vehicle. That AirTag, bearing serial number HGMKHHERP0GV, was taped underneath the front bumper of S.K.'s vehicle with white duct tape. Apple records confirmed that AirTag serial number HGMKHHERP0GV had been unpaired from the Defendant's Apple account on April 21, 2024.

On April 19, 2024, in the Eastern District of Pennsylvania, the FBI located and removed a third AirTag that the Defendant had placed on S.K.'s vehicle. This AirTag, bearing serial number HGMKHHNLP0GV, was wrapped in a blue medical mask and secured under the vehicle near the rear passenger side wheel well. The FBI inspected S.K.'s vehicle and did not locate any additional AirTags. That evening, S.K. returned briefly to her residence. After leaving her residence, S.K. discovered a fourth AirTag had been placed in her side-view mirror under the casing.

On April 23, 2024, S.K. provided the FBI with the fourth AirTag which had been placed in S.K.'s vehicle's side mirror on or around the evening of April 19, 2024. That AirTag bore serial number J09M3HVUP0GV. The FBI deactivated the AirTag in Philadelphia. Later that same day, the FBI observed the Defendant arrive to the location where they had deactivated the AirTag, exit his vehicle with his phone in his hand, and begin searching for the AirTag. Apple records confirmed that Apple AirTag, serial number J09M3HVUP0GV attempted to pair with the Defendant's Apple account on Apple on April 19, 2024, and was unpaired from the Defendant's Apple ID on April 23, 2024.

Between April 19, 2024, when S.K. located the fourth AirTag, and April 23, 2024, when the FBI deactivated it, the Defendant called S.K. and followed her to a carwash. The Defendant approached S.K.'s vehicle, banged on her windows, and demanded to know why S.K. was not answering his calls. S.K. described herself as paralyzed with fear by the Defendant's actions.

On April 25, 2024, S.K. received 5 voice messages from the Defendant between 11:36 a.m. and 11:46 a.m. during which the Defendant yelled and cursed at S.K., and threatened her. According to a translation of the messages, among other things, the Defendant stated:

> You don't deserve my salutation . . . ungrateful . . . you are worse than an animal. You are not a human. I said hello to you for the past three days. You are not human. No sign of humanity in you. You've lost everything . . . not even as a human being with good manners . . . do you understand me? Say no more. I will never look at you face, and I will never in my life say hello to you . . . do you understand me?
>
> You are not human. You are despicable, and you are a despicable person . . . you understand? Move away and don't look at me in the eye . . . I will say bad things to you and spit at your face . . . I'll call you despicable person . . . you are a bad-mannered person.
> It's okay, you will see . . . I have your photos. It is okay, I swear to God. I don't care that you were a wife or a mother . . . I'll show you . . . do you understand me? I have everything . . . same as you. You never deleted anything from your phone. Me neither . . . I ill not delete anything in life . . .….understand?"

On April 26, 2024, the FBI removed a fifth AirTag that the Defendant had placed on S.K.'s vehicle. This AirTag, bearing serial number J09M3EKGP0GV, was located in an opening within the vehicle's frame. The opening in the frame created a small, makeshift compartment which appeared to have previously been sealed with a rubber plug, but the rubber plug was pushed intothe compartment. The AirTag was wrapped inside a yellow rag. Apple records confirmed that Apple AirTag bearing serial number J09M3EKGP0GV had attempted to pair with the Defendant's Apple account on April 23, 2024, and was unpaired from it on April 26, 2024.

On April 27, 2024, at approximately 3:05 a.m., the Defendant's cell phone pinged approximately 0.2 miles from S.K.'s apartment, in the Eastern District of Pennsylvania. At approximately 9:26 a.m., S.K.'s cellphone alerted her to the presence of an AirTag near her. S.K. located the AirTag underneath the license plate on her car. On May 2, 2024, the FBI removed the aforementioned sixth AirTag from S.K.'s vehicle. The FBI removed the battery only briefly to document the serial number, and then placed the battery back into the AirTag ensuring that the

AirTag continued to work. The agents then placed the AirTag in a grassy area near a Wawa. A few hours later, the Defendant appeared at the Wawa and was observed looking for the AirTag.

After the Defendant's arrest for the above conduct, the Defendant admitted to stalking his ex-wife by placing the numerous AirTags on her vehicle.

### B. Conspiracy to Commit Money Laundering (Case. No 25-105- Count One)

From on or about January 4, 2021, through on or about October 17, 2023, the Defendant operated an unlicensed money transmitting service in which the Defendant would collect funds from individuals in the United States who wished to send funds overseas, primarily to Tajikistan. The Defendant generally collected these funds via the peer-to-peer mobile application Zelle. The FBI identified numerous financial accounts used by the Defendant to unlawfully transmit money overseas.

In a June 20, 2024, interview with the FBI the Defendant explained to law enforcement how his money remittance business worked. The Defendant charged a remittal fee of approximately 1.4%. Once the Defendant had collected a substantial amount of funds, the Defendant would wire the funds overseas. In general, the Defendant would wire the funds to companies in China in order to purchase plastic or other raw materials. The Defendant would direct the Chinese companies to send the goods he had ordered to a company in Tajikistan (Company 1). An individual in Tajikistan (Co-Conspirator 1) would then collect cash from Company 1 as payment for the goods and distribute the cash to the intended recipients. As part this conspiracy, the Defendant transmitted at least $2,538,395.16 overseas. The Defendant's admission to the conspiracy was corroborated by numerous financial records obtained by the FBI.

### C. Conspiracy to Bring Aliens to the United States (Case. No 25-105 – Count Two)

From on or about December 24, 2020, to on or about May 17, 2024, the Defendant conspired to bring aliens to the United States for private financial gain.

Following the execution of search warrants on the Defendant's residence on May 13, 2024, law enforcement recovered numerous electronic devices and located hundreds of immigration-related documents, passport style photos, financial records, and communications and photographs evidencing the defendant's involvement in a large-scale human smuggling operation.

Among other things, law enforcement was able to match up immigration paperwork belonging to various aliens and messages, photographs, and proof of payment, from those aliens to the Defendant that corresponded to those aliens' travel to, and entry into, the United States at a place other than a port of entry and without lawful admission documents. For example, some aliens that the Defendant assisted in entering the United States without authorization, sent him selfies along their travel route—from airport to airport and through the jungles of Nicaragua, Honduras, and Mexico.

The Defendant admitted that he would refer travelers to smugglers who specialized in bringing people across the border. As part of the conspiracy, the Defendant was paid a "finder's fee" or referral fee for each alien he assisted in smuggling to the United States. The Defendant worked with approximately ten other smugglers (many of whom he has identified by name and location and who the investigation has confirmed are involved in alien smuggling) and estimated that he had helped smuggle approximately 80 to 100 people to the United States.[2] Among other things, the Defendant worked with a conspirator (Co-Conspirator 2) who could obtain visas to enable aliens, from other countries such as Tajikistan, to travel to Mexico. From there, the

---

[2] The FBI was able to confirm between 25-99 individuals that were unlawfully smuggled by the Defendant into the United States.

Defendant and his conspirators would assist the aliens in entering the United States at a place other than a designated port of entry. The Defendant would provide advice and assistance to the aliens along their travel route to the United States.

### III.     SENTENCING CALCULATION

#### A.     Statutory Maximum Sentence.

The Court may impose the following statutory maximum sentence on each count:

Count One of the Indictment (Stalking, Case No. 24-cr-190): five years' imprisonment; three years of supervised release; a $250,000 fine; and a $100 special assessment.

Count One of the Information (Conspiracy to Commit Money Laundering, Case No. 25-cr-105): 20 years' imprisonment, three years of supervised release, a fine of $500,000 , and a $100 special assessment. Forfeiture of any property, real or personal, involved in the defendant's violation of Title 18, United States Code, Section 1956 may also be ordered.

Count Two of the Information (Conspiracy to Bring Aliens to the United States, Case No. 25-cr-105): 10 years' imprisonment, three years of supervised release, a $250,000 fine, and a $100 special assessment.

#### B.     Sentencing Guidelines Calculation.

The Probation Office correctly calculated the defendant's advisory guideline range as follows:

**Group I**: **Stalking (18 U.S.C. § 2261A(2))**

The guideline for a violation of 18 U.S.C. § 2261A(2) is USSG §2A6.2, which provides for a base offense level of 18. USSG §2A6.2(a). Since the offense involved a pattern of activity that included stalking, threatening, harassing, or assaulting the same victim, two levels are added. USSG §2A6.2(b)(1)(E). The adjusted offense level is 20.

**Group II**: **Conspiracy to commit money laundering (18 U.S.C. § 1956(h))**

The guideline for a violation of 18 U.S.C. § 1956(h) is USSG §2S1.1. In this case, the base offense level is established by adding eight levels to the corresponding level of the laundered funds under USSG §2B1.1. Since the defendant is accountable for laundering more than $1,500,000 but not more than $3,500,000, the 16 levels determined by USSG §2B1.1(b)(1)(I) are added to eight levels in USSG §2S1.1(a)(2), which results in a base offense level of 24. USSG §2S1.1(a)(2). Because USSG §2S1.1(a)(2) applies and the defendant was in the business of laundering funds, four levels are added. USSG §2S1.1(b)(2)(C). Since 2S1.1(b)(2)(B) applies and the offense involved complex or intricate conduct, such as layering two or more levels of transactions among foreign companies, constituting sophisticated laundering, another two levels are added. USSG §2S1.1(b)(3). The adjusted offense level is 30.

**Group III**: **Conspiracy to bring aliens to the United States (8 U.S.C. § 1324(a)(1))**

The guideline for a violation of 8 U.S.C. § 1324(a)(1) is USSG §2L1.1, and it provides for a base offense level of 12 in this case. USSG §2L1.1(a)(3). Since the offense involved the smuggling of between 25 and 99 aliens (the defendant helped smuggle at least 80 aliens into the United States), six levels are added. USSG §2L1.1(b)(2)(B). The offense created a substantial risk of death or serious bodily injury to another person by facilitating the perilous journey of aliens through treacherous terrain; therefore, two levels are added. USSG §2L1.1(b)(6). The adjusted offense level is 20.

Even though all three offenses are separately grouped, there is no adjustment to the offense level pursuant to USSG § 3D1.4. Units are assigned pursuant to USSG §3D1.4(a), (b) and (c). One unit is assigned to the group with the highest offense level. One additional unit is assigned for each group that is equally serious or from one to four levels less serious. One-half unit is assigned to any group that is five to eight levels less serious than the highest offense level.

Any groups that are nine or more levels less serious than the group with the highest offense level are disregarded. Thus, because the highest offense level is 30, and the other two offenses were 10 levels lower, there are disregarded and the adjusted offense level remains at 30.

The defendant has demonstrated acceptance of responsibility for the offense. Accordingly, the offense level is decreased by two levels. USSG §3E1.1(a). The defendant has assisted authorities in the investigation or prosecution of the defendant's own misconduct by timely notifying authorities of the intention to enter a plea of guilty. Accordingly, the offense level is decreased by one additional level. USSG §3E1.1(b). Based upon a total offense level of 27 and a criminal history category of I, the guideline imprisonment range is 70 to 87 months.

## IV.     GOVERNMENT'S RECOMMENDATIONS CONCERNING SENTENCING

The Supreme Court has declared: "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). "These requirements mean that '[i]n the usual sentencing, . . . the judge will use the Guidelines range as the starting point in the analysis and impose a sentence within the range." *Peugh v. United States*, 569 U.S. 530, 542 (2013) (quoting *Freeman v. United States*, 564 U.S. 522, 529 (2011) (plurality opinion); ellipsis in original). "Common sense indicates that in general, this system will steer district courts to more within-Guidelines sentences." *Peugh*, 569 U.S. at 543. "The federal system adopts procedural measures intended to make the Guidelines the lodestone of sentencing." *Id.* at 544.

In addition, this Court must also consider all of the sentencing considerations set forth in Section 3553(a). Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the

offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).

**B.    Application**

The relevant § 3553(a) factors will be discussed in turn.

### 1.    The Nature and Circumstances of the Offense

The defendant's criminal conduct was extensive, deliberate, and multifaceted. It spanned three separate federal offenses: stalking his ex-wife through repeated technological surveillance and threats; operating an unlicensed international money transmitting and laundering enterprise involving over $2.5 million; and conspiring to smuggle approximately 80 to 100 aliens into the United States for private financial gain.

The stalking offense was not limited to unwanted contact. The defendant secretly placed at least six tracking devices on the victim's vehicle, repeatedly monitored her movements in real time, followed her in person, and left threatening voicemails. The victim described being paralyzed with fear. The offense involved planning, persistence, and a conscious decision to exploit technology to intimidate and control another person.

The financial crimes were equally serious. Over nearly three years, the defendant operated a structured and sophisticated remittance scheme designed to move large sums of money overseas outside lawful channels. The laundering involved layering transactions through

foreign companies and coordinating international transfers. The scope—more than $2.5 million—demonstrates that this was a significant and sustained criminal enterprise.

Finally, the alien smuggling conspiracy was large-scale and profit-driven. The defendant worked with multiple co-conspirators, referred individuals to smugglers, facilitated visa arrangements, provided logistical guidance during travel through multiple countries, and received referral fees for each person brought unlawfully into the United States. The offense involved approximately 80 to 100 aliens and created substantial risks of death or serious bodily injury by routing individuals through dangerous terrain and irregular border crossings.

Taken together, these were not isolated lapses in judgment. They reflect calculated, repeated criminal conduct carried out over years, in different contexts, for financial gain and personal control.

### 2. The History and Characteristics of the Defendant

The defendant has no prior criminal history and falls within Criminal History Category I. He accepted responsibility for his conduct at an early stage by pleading guilty.

At the same time, the defendant was not a minor participant. He exercised direction and coordination within the conspiracy, handled funds, and personally met with individuals facilitating the smuggling scheme. His conduct reflects deliberate and knowing participation in a serious federal offense undertaken for financial gain.

### 3. The Need for Sentence Imposed to Reflect Seriousness of the Offense, Promote Respect for Law, and Provide Just Punishment

Each offense independently warrants a meaningful custodial sentence. Stalking through repeated electronic surveillance and threats strikes at the personal security and psychological

safety of the victim. It required federal law enforcement intervention to stop. A substantial sentence reflects the seriousness of exploiting technology to terrorize and control another person.

The money laundering conspiracy undermined the integrity of the financial system and involved millions of dollars moved outside regulated channels. Such conduct erodes confidence in lawful financial institutions and enables other unlawful activity.

The alien smuggling conspiracy directly undermined the nation's immigration laws and exposed vulnerable individuals to serious physical danger for profit. Facilitating unlawful entry through hazardous routes and coordinating payment schemes for that purpose is a serious federal offense.

### 4. The Need for Adequate Deterrence and Protection of Public

General deterrence is critical in all three contexts. Alien smuggling and money laundering schemes are financially motivated crimes that depend on the perception that profits outweigh risks. A significant custodial sentence is necessary to deter others who might view such conduct as a lucrative enterprise.

Specific deterrence is equally important. The defendant engaged in overlapping criminal conduct over an extended period. His actions demonstrate a willingness to exploit vulnerable individuals—whether a former spouse or migrants seeking entry into the United States—for personal gain or control. A custodial sentence is necessary to deter future criminal conduct and to protect the public.

### 5. The Need to Provide the Defendant with Training, Medical Care or

### Correctional Treatment

There is no demonstrated need to adjust the sentence in order to provide the defendant with educational or vocational training, medical care or additional treatment that cannot be adequately addressed by the Bureau of Prisons during incarceration.

### 6. The Need to Avoid Unwarranted Sentence Disparities Among Similarly Situated Defendants

Adherence to the recommended guideline range is generally the best course for assuring that the defendant's sentence is consistent with those imposed nationwide on similarly-situated offenders. Here, however, the defendant's guilty plea demonstrates his acceptance of responsibility for his conduct in this case and, at least in part, his willingness to move forward and become a productive member of society upon his release from prison. Thus, the government believes that a sentence within the recommended range is commensurate with the defendant's actions, it would be the most severe sentence the defendant has faced, and it takes into account, as detailed above, the individual circumstances and characteristics of this defendant as well as all of the 3553(a) factors.

## V. CONCLUSION

The government's final recommendation regarding sentencing appears in the sealed attachment.

Respectfully submitted,

DAVID METCALF
United States Attorney


*/s EVERETT WITHERELL*
EVERETT WITHERELL
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I hereby certify that this Sentencing Memorandum has been served on the Filing User identified below through the Electronic Case Filing (ECF) system:

Mark Wilson ESQ.

/s Everett Witherell
EVERETT WITHERELL
Assistant United States Attorney

DATED: March 5, 2026.